UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Jeffrey S. Pepin

   v.                                    Civil No. 11-cv-515-PB

Richard Gerry, Warden,
New Hampshire State Prison


**REPORT AND RECOMMENDATION**


Jeffrey Pepin ("Pepin") petitions for a writ of habeas corpus.  See 28 U.S.C. § 2254.  He asserts claims that he received ineffective assistance from both trial counsel (Claim 1) and appellate counsel (Claims 2 and 3), and further asserts that under the circumstances of his case, the imposition of sentences for three separate offences (first-degree assault, second-degree assault, and criminal restraint) violated his right to due process by violating the federal constitutional prohibition against double jeopardy.  Before me for a report and recommendation is respondent's motion for summary judgment.  Pepin objects.  For the reasons that follow, I recommend that respondent's motion be granted.


**The Legal Standard**

A federal court may grant habeas-corpus relief "only on the ground that [a petitioner] is in custody in violation of the

Constitution or laws or treaties of the United States."  28

U.S.C. § 2254(a).  The power of the federal courts to grant

habeas-corpus relief to state prisoners has been significantly

limited by passage of the Anti-Terrorism and Effective Death

Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d).  Under that

statute, when a prisoner brings a claim in federal court that

"was adjudicated on the merits in State court proceedings," 28

U.S.C. § 2254(d),

> [f]ederal habeas relief may not be granted  . . .
> unless it is shown that the earlier state court's
> decision "was contrary to" federal law then clearly
> established in the holdings of this Court, [28 U.S.C.]
> § 2254(d)(1); Williams v. Taylor, 529 U.S. 362, 412
> (2000); or that it "involved an unreasonable
> application of" such law, § 2254(d)(1); or that it
> "was based on an unreasonable determination of the
> facts" in light of the record before the state court,
> § 2254(d)(2).

Harrington v. Richter, 131 S. Ct. 770, 785 (2011) (parallel

citations omitted); see also Morgan v. Dickhaut, 677 F.3d 39, 46

(1st Cir. 2012).  As the Harrington Court went on to explain:

> If this standard is difficult to meet, that is
> because it was meant to be.  As amended by AEDPA, §
> 2254(d) stops short of imposing a complete bar on
> federal court relitigation of claims already rejected
> in state proceedings.  Cf. Felker v. Turpin, 518 U.S.
> 651, 664 (1996) (discussing AEDPA's "modified res
> judicata rule" under § 2244).  It preserves authority
> to issue the writ in cases where there is no
> possibility fairminded jurists could disagree that the
> state court's decision conflicts with this Court's
> precedents.  It goes no farther.  Section 2254(d)
> reflects the view that habeas corpus is a "guard
> against extreme malfunctions in the state criminal
> justice systems," not a substitute for ordinary error

correction through appeal.  Jackson v. Virginia, 443
U.S. 307, 332, n.5 (1979) (Stevens, J., concurring in
judgment).  As a condition for obtaining habeas corpus
from a federal court, a state prisoner must show that
the state court's ruling on the claim being presented
in federal court was so lacking in justification that
there was an error well understood and comprehended in
existing law beyond any possibility for fairminded
disagreement.

Harrington, 131 S. Ct. at 786-87 (parallel citations omitted).

"AEDPA's strict standard of review only applies to a claim
that was adjudicated on the merits in state court proceedings."
Lyons v. Brady, 666 F.3d 51, 53-54 (1st Cir. 2012) (quoting
Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001)).  "When the
state court has never addressed the particular federal claim at
issue, federal review is de novo," Dugas v. Coplan, 506 F.3d 1,
7 (1st Cir. 2007) (citing Pike v. Guarino, 492 F.3d 61, 67 (1st
Cir. 2007)), because a reviewing court "can hardly defer to the
state court on an issue that the state court did not address,"
Yeboah-Sefah v. Ficco, 556 F.3d 53, 66 (1st Cir. 2009) (quoting
Fortini, 257 F.3d at 47).

## Background

In the opinion that resulted from Pepin's direct appeal of
his convictions, the New Hampshire Supreme Court determined that
Pepin's jury could have found the following facts.  During the
evening of October 15, 2004, in the home he shared with his
then-wife, Mary, Pepin began swearing and yelling at Mary, and

an argument ensued.  See State v. Pepin (Pepin I), 156 N.H. 269, 271 (2007).  As a result, Mary decided to spend the night elsewhere.  See id.  Then:

> She began climbing the stairs to the laundry room when the defendant met her halfway and refused to let her pass.  He held onto her and stood in her way so that she could not continue up the stairs.  She tried to go around him, but he blocked her way and continued to hold onto her.
>
> The victim started to panic and tried to go downstairs to phone for help.  The defendant grabbed her by the arms and dragged her up the stairs saying, "[O]h no, you don't."  After dragging her up to the landing of the first stairway, he said, "I don't know why I even still bother with you, say good-bye," put his hands around her neck, and choked her.  The victim tried to stop him, but soon lost consciousness.  After she regained consciousness, the victim jumped up and tried to go downstairs, but the defendant stood in front of her and held her arms so that she could not get past him.  The victim then attempted to go upstairs, but the defendant again held her arms from behind to prevent her from doing so.  Suddenly, he stopped holding her from behind and started pushing her forward up the remaining stairs saying: "I've had it.  I've f'ing had it, I might as well finish it and end it now, it's over for you bitch."  When they reached the top of the stairs, the defendant grabbed her by the arm and the back of the head and slammed her face into the wooden floor four or five times.  She was bleeding from her nose and in her mouth.  He then choked her again and she again lost consciousness.

Id. at 271—72.

In December of 2004, Pepin was indicted for: (1) first-degree assault, see N.H. Rev. Stat. Ann. ("RSA") § 631:1; (2) second-degree assault, see RSA 631:2; and (3) criminal

restraint, <u>see</u> RSA 633:2.[1]  All three charges were based on the events of October 15, 2004.  The indictment for first-degree assault charged that:

> 1.   Jeffrey Pepin purposely caused serious bodily injury to Mary Pepin, specifically, a broken nose and a broken tooth,
>
> 2.   by repeatedly slamming Mary Pepin's head into the floor.

Pet., Ex. 13 (doc. no. 15-1), at 1.  The indictment for second-degree assault charged that:

> 1.   Jeffrey Pepin recklessly caused bodily injury to Mary Pepin, specifically, bruises to the neck area,
>
> 2.   under circumstances manifesting extreme indifference to the value of human life,
>
> 3.   in that Jeffrey Pepin strangled Mary Pepin on two occasions to the point that Mary Pepin lost consciousness.

<u>Id.</u> at 2.  The indictment for criminal restraint charged that:

> 1.   Jeffrey Pepin knowingly confined Mary Pepin unlawfully to the Pepin home,
>
> 2.   under circumstances exposing her to risk of serious bodily injury,
>
> 3.   in that Jeffrey Pepin would not allow Mary Pepin to leave the Pepin home after Jeffrey Pepin strangled Mary Pepin with both of his hands to the point that she lost consciousness.

<u>Id.</u> at 3.

---

[1]  Pepin was also indicted on two counts of attempted murder, but was acquitted of those charges, and they do not figure into any of his claims for habeas-corpus relief.

Before Pepin's trial, the State moved to admit evidence
that in May of 2004, approximately five months before the
conduct for which he was charged, Pepin had threatened Mary.
The May threats resulted in a conviction in the Auburn District
Court for the Class B misdemeanor of criminal threatening.
Among other things, the State sought to admit evidence of
Pepin's conviction as evidence of the threats he made.  The
State's avowed purpose for introducing that evidence was to show
Pepin's intent and motive on the evening of October 15, 2004.
In the State's view, Pepin's threats against Mary in May were
prior bad acts, evidence of which was admissible under Rule
404(b) of the New Hampshire Rules of Evidence.  While the State
sought to admit evidence of Pepin's threats, including his
criminal-threatening conviction, under Rule 404(b), it did not
seek to introduce evidence of Pepin's conviction for the purpose
of impeaching his credibility under Rule 609(a).  Pepin, in
turn, moved to exclude the prior-bad-act evidence and evidence
of his conviction.  After conducting a hearing, Judge Nadeau
issued an order allowing the admission of two threats, pursuant
to Rule 404(b), but declining to "allow . . . the defendant's
conviction in Auburn District Court of criminal threatening, in
as evidence."  Resp't's Mot. Summ. J, Ex. A (conventionally
filed), at 51.

At trial, Pepin's counsel referred, in his opening
statement, to a threat against Pepin that had been made by a man
whose wife was one of Pepin's business acquaintances.  Counsel
for the State objected on hearsay grounds.  At the ensuing bench
conference, the following conversation took place:

> THE COURT: It's a threat, it's not hearsay.
> I'm not sure it's relevant.

> MR. WATKINS: It's all relevant to the
> criminal threat.

> THE COURT: What criminal threat?

> MR. WATKINS: The criminal threat that you're
> going to allow Mary to testify to.

> THE COURT: How is it relevant to that?

> MR. WATKINS: It's connected with it, judge.

> Ms. CONWAY: Well, how?

> THE COURT: I need an offer of proof if you
> want me to allow you to get into it.

> MR. WATKINS: It's the same assertion.  My
> client's going to say that he never threatened Mary,
> that it was Nick, Cheryl's husband, who called and
> said I'm going to shoot you in the head.  That's the
> only reference that Jeff was making to his wife during
> that argument [i.e., the argument during which the
> State claimed that Pepin threatened Mary].

> MS. CONWAY: He's convicted of that criminal
> threatening.

> MR. WATKINS: He pled nolo.

> THE COURT: He pled nolo.

> MS. CONWAY: I know that, but he was
> convicted of it.

        THE COURT: Okay.  I'll allow you to get into it.

        MS. CONWAY: Judge, if he gets into that, I think I should be able to cross him and say you were convicted of that if he testifies.

        THE COURT: Well, we'll cross that bridge if we get to it.  There's a huge difference between someone admitting guilt and pleading nolo in terms of allowing it into court.  We'll cross that bridge when we get to it.  You need to know it's a possibility.

Trial Tr., Day Two, at 31-32.

Pepin later testified in his own defense.  On direct examination, the following exchange took place:

    Q   And did this issue involving it [i.e., Pepin's threats against Mary in May of 2004] come up in counseling with Joan Cavoli?

    A   Yes.

    Q   Okay.  How was it initiated?

    A   It was initiated like well, could you kill your wife. . . .

Trial Tr., Day 4, at 75.  On cross-examination, counsel for the State followed up on the testimony Pepin had given on direct:

    Q   A few weeks later when you met with Doctor Joan Cavoli, you said on your direct examination that the counselor brought it up and said could you kill your wife.  She asked you that question, could you kill your wife.  Is that what she asked you?

    A   That wasn't the direct question she asked me.

    Q   Isn't that what you just testified to, sir?

         A    Her direct question was could you kill
someone.  It was a very general question.

         Q    Didn't you just testify that she asked you
if you could kill your wife?

         A    No.  She asked me if I could kill someone.

         Q    What was your response?

         A    I don't recall exactly the words that I
used.

         Q    Your response was, if someone's buttons are
pushed hard enough, they can do anything, right,
they're capable of anything.  Isn't that what you
said?

         A    If someone is put into a situation where
there are no other alternatives, I think that's
possible.

Id. at 128-29.  At this point, counsel for the State requested a

bench conference.  That conference included the following

exchange:

         MS. CONWAY: I'd like to cross him with the
conviction, the criminal threatening.

         THE COURT: I think it's appropriate now.  I
originally ruled that the state could not use that
conviction during opening statements when the defense
provided the explanation for what the actual threat
was in court and said to the defense that I could
possibly let in the conviction after I heard the
testimony.

         In this case, the defendant entered a nolo
conviction, which is essentially a denial of guilt and
an admission that the state can prove the case beyond
a reasonable doubt.

         After hearing the defense direct testimony and
given the discrepancy between the state's evidence and
the defendant's explanation, then it's fair to allow

the state to cross-examine him to give the jury the
context to hear the evidence.

> . . . .

> THE COURT: The nolo conviction is entered as
> a conviction. . . .  I'm going to allow the state to
> cross-examine him on this given his explanation for
> the threat.

> MR. WATKINS: Over the defendant's objection.
> Thank you.

Trial Tr., Day Four, at 129-30.  After the bench conference,

Pepin's cross-examination continued:

> Q    Mr. Pepin, isn't it true that you were
> convicted of criminal threatening back in June of 2004
> for the threat that we were just talking about, when
> Mary caught you on the phone?

> A    I pled nolo to the charge.

> Q    And isn't it true that you were convicted of
> criminal threatening?

> A    I pled nolo to the charge.

> Q    Isn't it true that you were convicted –

> MR WATKINS: Asked and answered, judge.

> THE COURT: Sustained.

Id. at 131.

In her closing argument, counsel for the State mentioned

the threat Pepin made in May of 2004.  See Trial Tr., Day Five,

at 42.  She also devoted significant attention to attacking

Pepin's credibility; the portion of her closing argument devoted

to that issue covers more than four and one half pages of the

10

trial transcript.  <u>See</u> Trial Tr., Day Five, at 35-39.  But, she did not mention either Pepin's <u>nolo</u> plea or his conviction in her discussion of Pepin's credibility or anywhere else in her argument.

At the conclusion of his trial, Pepin was acquitted of two counts of attempted murder but was convicted of first-degree assault, second-degree assault, and criminal restraint.  For first-degree assault, he was sentenced to seven and one half to fifteen years, stand committed.  For second-degree assault, he was sentenced to three and one half to seven years, all suspended, to be served consecutively to the sentence for first-degree assault.  For criminal restraint, he was sentenced to three and one half to seven years, all suspended, to be served consecutively to the sentence for first-degree assault and concurrently with the sentence for second-degree assault.  The post-trial travel of Pepin's case is described in my order in preliminary review.  <u>See</u> doc. no. 5, at 7-10.

As construed in that order, Pepin's petition consists of the following claims:

> 1.    Pepin received ineffective assistance of counsel, in violation of his Sixth and Fourteenth Amendment rights, when his trial attorney failed to: . . . (b) object to the court's imposition of multiple convictions and sentences for lesser included offenses; (c) argue that Pepin's convictions are duplicative and should be merged into a single conviction under the rule of lenity; (d) argue that multiple convictions and sentences violated Pepin's

double jeopardy rights and due process; (e) object to evidence improperly admitted at trial under N.H.R. Ev. 410 and 609; and (f) protect Pepin from violations of the Fourth, Fifth, Sixth, and Fourteenth Amendments.[2]

2.   Pepin received ineffective assistance of counsel, in violation of his Sixth and Fourteenth Amendment rights, when his appellate attorney briefed issues known to be unpreserved regarding: (a) excited utterance; (b) doctor-patient privilege; (c) the admission of evidence under N.H.R. Ev. 401, 403, 404(b), 410, 502, 503, 609, 609(a), and 803; and (d) a Fourth Amendment violation.

3.   Pepin received ineffective assistance of counsel, in violation of his Sixth and Fourteenth Amendment rights, when his appellate attorney failed to raise meritorious issues on appeal concerning: (a) multiple convictions for lesser-included offenses, in violation of Pepin's double jeopardy rights; (b) merger convictions on duplicative indictments under the rule of lenity; (c) due process violations; and (d) double jeopardy violations.

4.   The trial court violated Pepin's double jeopardy and due process rights under the Fifth and Fourteenth Amendments when it: (a) imposed illegal convictions and sentences on lesser-included offenses; and (b) failed to merge duplicative charges.[3]

---

[2] My order also described a claim labeled 1(a), but in an endorsed order dated May 8, 2012, I granted Pepin's motion to forego that claim.

[3] While Pepin claims that the trial court violated his rights under the Double Jeopardy Clause by failing to merge the charges against him, it is important to note that merger is "a question of state law, not cognizable on federal habeas review," Dennis v. Poppel, 222 F.3d 1245, 1258 (10th Cir. 2000) (citing Handley v. Page, 398 F.2d 351, 352 (10th Cir. 1968)).  Thus, to the extent merger plays a role in Claim 4, it does so not as a free-standing claim of error, but only in the context of Pepin's double-jeopardy claim.

Order (doc. no. 5), at 10-11.  My order also described a fifth

claim, captioned "actual innocence," but I subsequently

determined that Claim 5 was unnecessary, and ordered that

Pepin's petition would thereafter be construed as consisting of

Claims 1-4.  See Order (doc. no. 7), at 2.

### Discussion

I begin with Claim 4, and then turn to the portions of

Pepin's three other claims that remain for resolution in light

of my recommended disposition of Claim 4.

### A. Claim 4

In Claim 4, Pepin asserts that the trial court violated his

right to be free from double jeopardy, and his right to due

process, by: (1) imposing sentences for second-degree assault

and criminal restraint which, in his view, are lesser-included

offenses of first-degree assault; and (2) failing to merge the

duplicative charges against him.  His basic argument is that he

had a constitutional right not be given three sentences for

conduct that was "all part of the same incident, under the same

set of circumstances, the same time, and place, with identical

injury."  Pet., Ex. 14 (doc. no. 1-16), at 1.  In his motion for

summary judgment, respondent argues that Pepin was lawfully

given three sentences for three separate offenses.  Pepin has

little to say in his objection to summary judgment other than to

assert that "respondent does not dispute the fact that 2nd degree assault and criminal restraint are lesser-include[d] offenses of 1st degree assault and/or each other."[4]  Pet'r's Obj. (doc. no. 16) ¶ 4.  Pepin has suffered no violation of his right to be free from double jeopardy, which is the only federally protected right at issue in Claim 4.

I begin my discussion of Claim 4 by sketching the rather complicated procedural history of the issue raised therein. Then I turn to the analysis of Pepin's double-jeopardy claim.

### 1. Procedural History

Neither Pepin's trial counsel nor the appellate counsel who handled his direct appeal ever claimed that the imposition of more than one sentence in this case would violate, or did violate, Pepin's double-jeopardy rights.  After the state supreme court rendered its decision on his direct appeal, Pepin filed a petition for a writ of habeas corpus (hereinafter "first habeas petition") which the trial court treated as a motion for a new trial, because it alleged ineffective assistance of counsel.  See Resp't's Mot. Summ. J., Ex. C (conventionally filed), at A54; State v. Pepin (Pepin II), 159 N.H 310, 310 (2009).

_____

[4] That is not quite accurate.  Respondent does argue that "[t]he three indictments contain differences in elements and in the facts alleged."  Resp't's Mem. of Law (doc. no. 15-1), at 23.

Pepin's first habeas petition marked the initial appearance of double jeopardy in this case, and he invoked that constitutional protection in the context of a claim that his trial counsel provided ineffective assistance by failing to challenge the constitutionality of imposing more than one sentence on him.  Judge Nadeau ruled that to the extent that Pepin's ineffective-assistance claim was based upon his trial counsel's failure to assert his double-jeopardy rights, the claim was procedurally barred, pursuant to the rule enunciated in Avery v. Cunningham, 131 N.H. 138, 143 (1988).

Pepin appealed, and the state supreme court ruled in his favor, holding that "the trial court should have heard the merits of the defendant's ineffective assistance of counsel claims concerning due process and double jeopardy."  Pepin II, 159 N.H. at 313.  The court concluded its opinion this way:

> After our order accepting his appeal, the defendant filed an assented to motion to add [an] issue.  We granted the motion and added the issue of whether the trial court erred in ruling that the defendant's claims that his sentences violated due process and double jeopardy were procedurally barred. Our subsequent review of the record revealed that the superior court did not rule on this issue and we decline to review it in the first instance. Accordingly, we remand for the trial court to address these claims.

Id.

Judge Nadeau began her order on remand by noting that "[t]he Supreme Court remanded this case for consideration on the

15

merits of one of the defendant's claims of ineffective
assistance of counsel." Pet., Ex. 10 (doc. no. 1-12), at 2.
She ruled as follows:

> The defendant's pleading on this issue is vague,
> but appears to allege that because he was tried on two
> counts of Attempted Murder, one count of First Degree
> Assault, one count of Second Degree Assault and one
> count of Criminal Restraint, all arising from the same
> brutal attack of his wife, his right to be protected
> against double jeopardy was denied. A simple review
> of the file, however, reveals that while he was
> charged with all the offenses, he was acquitted of
> both Attempted Murder charges, each of which alleged
> alternate theories of criminal liability. With
> respect to the remaining charges upon which the
> defendant was sentenced, they each alleged different
> conduct, convictions . . . which simply do not
> implicate double jeopardy.

> Accordingly, the defendant's motion is denied on
> the merits.

Id. at 2-3.

In 2011, Pepin filed another petition for a writ of habeas
corpus in the superior court (hereinafter "second habeas
petition"). See Pet., Ex. 6 (doc. no. 1-8). In it, he
"assert[ed] that he was denied the constitutional protection
against double jeopardy because (1) two of his convictions –
second degree assault and criminal restraint – are lesser
included offenses of his conviction for first degree assault and
(2) the three indictments were all based on the same facts and
evidence." Id. at 7. He "also argued that [his] three
indictments [were] subject to merger." Id. at 8. Judge

Wageling dismissed Pepin's double-jeopardy claim on grounds of res judicata. See id. at 7-8.  Regarding merger, Judge Wageling ruled:

> The court declines to address defendant's merger claim
> because it is essentially a restatement of his double-
> jeopardy claim – i.e. that the indictments are
> alternate theories of the same offense based on the
> same facts.  Therefore, Petitioner's merger claim is
> dismissed under the doctrine of res judicata.

Id. at 8.

### 2. Analysis

Based upon the procedural history described in the previous section, it would appear that the last substantive word on double jeopardy from the New Hampshire courts was written in Judge Nadeau's order on remand.  That order frames itself as a consideration of the ineffective-assistance claim that was remanded, but concludes with a discussion of double jeopardy, which was the issue underlying the ineffective-assistance claim. Thus, Judge Nadeau's order may reasonably be construed, for habeas corpus purposes, as an adjudication on the merits of: (1) both the ineffective-assistance claim and the double-jeopardy claim; or (2) just the ineffective-assistance claim.  While the former was very likely Judge Nadeau's intent, out of an abundance of caution, I review de novo the question of whether Pepin was deprived by the trial court of his right to be free from double jeopardy.

a. Legal Principles

The Fifth Amendment to the United States Constitution,
which is "is 'applicable to the States through the Fourteenth
Amendment'" Ferrell v. Wall, 862 F. Supp. 2d 88, 103 n.18
(D.R.I. 2012) (quoting Monge v. California, 524 U.S. 721, 727
(1998)), provides that "[n]o person shall . . . be subject for
the same offence to be twice put in jeopardy of life or limb."
U.S. Const. amend. V.

> The Double Jeopardy Clause affords protection in three
> distinct situations: "It protects against a second
> prosecution for the same offense after acquittal.  It
> protects against a second prosecution for the same
> offense after conviction.  And it protects against
> multiple punishments for the same offense."

Ferrell, 862 F. Supp. 2d at 103 (quoting Jackson v. Coalter, 337
F.3d 74, 81 (1st Cir. 2003); citing United States v. Ortiz-
Alarcon, 917 F.2d 651, 653 (1st Cir. 1990)).

As to the scope of the third form of double-jeopardy
protection, which is the form of protection at issue in this
case, the United States Supreme Court has explained:

> Where consecutive sentences are imposed at a single
> criminal trial, the role of the constitutional
> guarantee is limited to assuring that the court does
> not exceed its legislative authorization by imposing
> multiple punishments for the same offense.  See Gore
> v. United States, 357 U.S. 386 (1958); Bell v. United
> States, 349 U.S. 81 (1955); Ex parte Lange, 18 Wall.
> 163 (1874).

Brown v. Ohio, 432 U.S. 161, 165-166 (1977) (parallel citations
omitted).

Turning to the question of what qualifies as the "same offense" in a multiple-punishment case, the court of appeals for this circuit has given the following guidance:

> Multiple punishment cases . . . come in two varieties. First, there are the so-called "double-description" cases, in which the issue is whether two statutes describe two separate offenses or are "merely different descriptions of the same offense." Gore v. United States, 357 U.S. 386, 392 (1958); see also Westen & Drubel, Toward a General Theory of Double Jeopardy, 1978 Sup. Ct. Rev. 81, 111.  Second, there are "unit of prosecution" cases [where] the problem is not that the same course of conduct is proscribed by more than one statute but that a defendant's continuing course of conduct is fragmented into more than one violation of a single statutory provision. Id.; see Callanan v. United States, 364 U.S. 587, 597 (1961).

Tarrant v. Ponte, 751 F.2d 459, 461 n.1 (1st Cir. 1985) (parallel citations omitted).

With respect to double description, the United States Supreme Court has explained:

> The established test for determining whether two offenses are sufficiently distinguishable to permit the imposition of cumulative punishment was stated in Blockburger v. United States, 284 U.S. 299, 304 (1932):
>
> > "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not. . . . "
>
> This test emphasizes the elements of the two crimes. "If each requires proof of a fact that the other does not, the Blockburger test is satisfied,

notwithstanding a substantial overlap in the proof
offered to establish the crimes. . . . " <u>Iannelli v.
United States</u>, 420 U.S. 770, 785 n. 17 (1975).

<u>Brown</u>, 432 U.S. at 166 (parallel citations omitted).  Based upon

the test stated in <u>Blockburger</u>, "[d]ouble jeopardy 'forbids

successive prosecution and cumulative punishment for a greater

and lesser included offense.'" <u>United States v. Medina-

Villegas</u>, 700 F.3d 580, 585 (1st Cir. 2012) (quoting <u>Brown</u>, 432

U.S. at 169).

Identifying a constitutionally permissible unit of

prosecution is a matter of ascertaining the intent of the

legislature that enacted the statute at issue.  <u>See</u>, <u>e.g.</u>,

<u>Brown</u>, 432 U.S. at 169-70; <u>Krueger v. Coplan</u>, 238 F. Supp. 2d

391, 394 (D.N.H. 2002) (explaining, in double-jeopardy claim

brought under § 2254, that "[u]nder New Hampshire law, each

separate act or attempted act of fellatio constituted a distinct

offense") (citing <u>State v. Krueger</u>, 146 N.H. 541, 543 (2001);

<u>State v. Paulsen</u>, 143 N.H. 447 (1999); <u>State v. Patch</u>, 135 N.H.

127 (1991)); <u>see also</u> <u>Demeritt v. Warden, N.H. State Prison</u>, No.

Civ.03-535-JD, 2004 WL 2966910, at *5 (D.N.H. Dec. 23, 2004)

(turning to New Hampshire law to determine appropriate unit of

prosecution for purpose of resolving double-jeopardy claim in

case brought under § 2254); <u>Perez v. Spencer</u>, No. Civ.A.02-

11675-DPW, 2003 WL 21518742, at *4 (D. Mass. July 2, 2003) ("in

order to determine whether Petitioner has been denied the third

variation of double jeopardy protection, inquiry must be made into the legislature's intent in enacting" the statute under which the petitioner had been charged) (citing Ohio v. Johnson, 467 U.S. 493, 499 n.8 (1984)).

Based upon the legal principles described above and the facts of this case, for Pepin to prevail on his double-jeopardy claim, he must establish, at a minimum, that he received two sentences for committing crimes that were legally the same, and that his convictions for those crimes were based upon the same conduct.  Having described the controlling legal principles, the court turns to the two pairs of offenses that, in Pepin's view, are the same, for purposes of double jeopardy.  Those pairs of offenses are: (1) first-degree assault and second-degree assault; and (2) first-degree assault and criminal restraint.[5]

### b. First-Degree Assault & Second-Degree Assault

In New Hampshire, a person is guilty of the Class A felony of first-degree assault if, among other things, he or she "[p]urposely causes serious bodily injury to another."  RSA 631:1, I(a).  A person is guilty of the Class B felony of

---

[5] Pepin does argue that second-degree assault and criminal restraint are lesser included offenses of first-degree assault and/or each other, thus setting up a third pair of offenses to consider, second-degree assault and criminal restraint.  But, everything I have to say about the relationship between first-degree assault and criminal restraint applies with equal force to the relationship between second-degree assault and criminal restraint.

second-degree assault if, among other things, he or she "[k]nowingly or recklessly causes serious bodily injury to another." RSA 631:2, I(a). Based upon the Blockburger test, first-degree assault and second-degree assault satisfy the double-description aspect of the double-jeopardy inquiry; a prosecutor who has established first-degree assault necessarily has established second-degree assault as well. See Brown, 432 U.S. at 168 (holding that joyriding is lesser-included offense of auto theft because "the prosecutor who has established auto theft necessarily has established joyriding as well").

However, for Pepin to establish a double-jeopardy violation, it is not enough to show that he was sentenced for both a greater offense and its lesser-included offense; he must also show that the two sentences were based upon the same conduct. See Tracy v. Olson, 400 F. Supp. 2d 393, 399 (D. Mass. 2005) ("if the convictions relate to two separate and distinct acts, prosecuting the defendant for two crimes does not implicate double jeopardy") (citing United States v. Felix, 503 U.S. 378, 385-86 (1992)). While Pepin has plainly established that first-degree assault and second-degree assault satisfy the double-description component of the double-jeopardy inquiry, he is unable to establish that his convictions and sentences for those two offenses were based on an impermissible fragmentation of a unitary course of conduct.

In the memorandum of law in support of his second state-court habeas petition, Pepin described the altercation underlying his convictions and sentences as "a brief incident," Pet., Ex. 14 (doc. no. 1-16), at 3, and as "a single continuous act," id., "which occurred at the same place, day and time against the same victim," id. He also acknowledged, however, that Mary emerged from the altercation with "a non-displaced nasal fracture, a chipped tooth, [and] minor bruising to her arm and neck," id. The dispositive question is whether the conduct by Pepin that resulted in Mary's injuries was a single act that was impermissibly divided into multiple acts for purposes of charging, trial, and sentencing. It was not.

It is well established that "[t]he Double Jeopardy Clause is not such a fragile guarantee that prosecutors can avoid its limitations by the simple expedient of dividing a single crime into a series of temporal or spatial units." Brown, 432 U.S. at 169 (citing Braverman v. United States, 317 U.S. 49, 42 (1942)). In Brown:

> On November 29, 1973, the petitioner, Nathaniel Brown, stole a 1965 Chevrolet from a parking lot in East Cleveland, Ohio. Nine days later, on December 8, 1973, Brown was caught driving the car in Wickliffe, Ohio.

432 U.S. at 162. He was charged by the Wickliffe police with joyriding, pled guilty, and was sentenced to thirty days in jail for joyriding. See id. Thereafter, he was indicted by the

Cuyahoga County grand jury for auto theft, and he was ultimately
sentenced for that offense.  See id. at 162-63.  Brown
challenged his sentence for auto theft, and the Ohio Court of
Appeals "held that under Ohio law the misdemeanor of joyriding
was included in the felony of auto theft," id. at 163, but also
held that Brown's second prosecution was permissible, see id.
The state appellate court explained:

> The two prosecutions are based on two separate
> acts of the appellant, one which occurred on November
> 29th and one which occurred on December 8th.  Since
> appellant has not shown that both prosecutions are
> based on the same act or transaction, the second
> prosecution is not barred by the double jeopardy
> clause.

Id. at 164.

The United States Supreme Court was not persuaded.  With
respect to the division of Brown's nine-day joyride into more
than one crime, the Court had this to say:

> After correctly holding that joyriding and auto
> theft are the same offense under the Double Jeopardy
> Clause, the Ohio Court of Appeals nevertheless
> concluded that Nathaniel Brown could be convicted of
> both crimes because the charges against him focused on
> different parts of his 9-day joyride.  We hold a
> different view. . . .  The applicable Ohio statutes,
> as written and as construed in this case, make the
> theft and operation of a single car a single offense.
> Although the Wickliffe and East Cleveland authorities
> may have had different perspectives on Brown's
> offense, it was still only one offense under Ohio law.
> Accordingly, the specification of different dates in
> the two charges on which Brown was convicted cannot
> alter the fact that he was placed twice in jeopardy
> for the same offense in violation of the Fifth and
> Fourteenth Amendments.

432 U.S. at 169-70 (citations to the record, parallel citations, and footnote omitted).

Just as the United States Supreme Court turned to Ohio law in Brown, this court must turn to New Hampshire law to determine the proper unit of prosecution for the events that transpired in the Pepin home on the evening of October 15, 2004.  While there is no New Hampshire Supreme Court opinion that is directly on point, that court's decision in State v. Young, 159 N.H. 332 (2009), provides an instructive example of the impermissible division of a single crime into a series of units.

In Young, the jury could have found that Damian Young fired multiple gunshots into a parked car, seriously injuring two men, including Nathanial Addo-Gyang.  See 159 N.H. at 335.  Young was convicted of attempted murder and first-degree assault based upon the shots he fired at Addo-Gyang.  See id.  On appeal, Young argued that the superior court violated both the federal constitutional prohibition against double jeopardy and New Hampshire's common-law doctrine of merger by imposing consecutive sentences for attempted murder and assault.  See id. at 341.  Because the state supreme court accepted the defendant's merger argument, it declined to address his double-jeopardy claim.  See id.  Even so, the analysis in Young merits this court's attention, as federal courts adjudicating claims

under § 2254 often "look to state court decisions to define merger for double jeopardy purposes." Yparrea v. Dorsey, 64 F.3d 577, 580 (10th Cir. 1995).

In defense of the trial court's failure to merge the charges against the defendant in Young, "[t]he State argue[d] that imposition of consecutive sentences [did] not violate the doctrine of merger because each of the ten bullets fired into the car comprise[d] a separate criminal act."  159 N.H. at 341. In rejecting that argument, the court observed that "a single transaction can give rise to multiple, distinct offenses," id. (emphasis added), but placed great weight on the fact that, in the case before it, both of the indictments, i.e., the one for attempted murder and the one for first-degree assault, "charged the defendant with the identical criminal activity; namely, intentionally discharging a firearm into the vehicle occupied by Addo-Gyang."  Id. at 342.  The court elaborated on its rejection of the State's ten bullets/ten crimes theory:

> The State seeks to isolate each of the ten bullets
> that were collectively discharged by the shooters as
> separate criminal acts.  According to the State, one
> of the bullets hit a victim other than Addo-Gyang and
> two lodged in a first aid kit.  Thus, it argues, any
> single bullet could have satisfied the substantial
> step alleged in the attempted murder indictment,
> whereas the bullets that did not hit Addo-Gyang could
> not support the bodily injury element alleged in the
> assault indictment.  This may be true, but, under
> [State v.] Naughton [139 N.H. 73 (1994)], we look to
> how the State actually charged the defendant.  Id.
> The State does not provide any authority to justify

> varying from this approach.  Accordingly, because both
> indictments alleged the defendant's discharge of the
> firearm as a single criminal transaction, we conclude
> that they were based upon identical criminal activity.

Id. 342-43.

At the end of its opinion, the court emphasized that "the State did not distinguish among the bullets fired by the defendant when charging him with assault and attempted murder." Young, 159 N.H. at 343.  Because "the same shooting activity was the basis of both indictments," id., and "the criminal activity of attempted murder identified in [Young] subsume[d] the criminal activity of seeking to cause bodily injury that same person with the same conduct," id., the court held that the common-law doctrine of merger applied, and that the trial court erred by imposing consecutive sentences, see id.

A counterpoint to Young may be found in the Report and Recommendation by Magistrate Judge Dein that Judge Stearns adopted in Tracy.  In that case, the defendant shot the victim a total of five times.  See Tracy, 400 F. Supp. 2d at 396.  At least three bullets struck the victim (one in the arm and one in the side), and another bullet grazed his skin.  See id.  On appeal, the defendant challenged, on double-jeopardy grounds, the sentences he received for assault with intent to murder and assault with intent to maim.  See id. at 397.  In its opinion

affirming the sentences, the Massachusetts Appeals Court
explained:

> The indictment for assault with intent to maim
> was based on the defendant's act of shooting the
> victim in the arm, causing a disabling injury, while
> the assault with intent to murder was based on a
> wholly separate and distinct act of the defendant –
> firing at least two shots into the victim's body.  All
> the shots occurred within a period of thirty seconds.
> After the first shot, the defendant had time to
> contemplate his acts; yet he moved into a better
> position to shoot the victim.  Based on the evidence a
> jury reasonably could find that the two episodes
> constituted separate acts that warranted two separate
> convictions and sentences.

Id. at 397-98 (citing Commonwealth v. Simpson, 704 N.E.2d 1131

(Mass. 1999)).  In her Report and Recommendation, the Magistrate

Judge determined: "The conclusion by the Appeals Court that

there were two separate events and that Tracy's convictions for

both do not constitute a violation of the Double Jeopardy Clause

is not contrary to or an unreasonable application of established

Federal law."  Tracy, 400 F. Supp. 2d at 399.  She further

explained:

> Tracy's case differs significantly from
> Commonwealth v. Sullivan, 482 N.E.2d 1198 (Mass. App.
> Ct. 1985), on which he relies.  There, a sequence of
> blows with a knife was found to be "so close that as a
> matter of fact and sense the acts involved were so
> intertwined as to be one."  Id. at 1203.  In Tracy's
> case, however, the Appeals Court relied on
> Commonwealth v. Simpson, 704 N.E.2d 1131, 1132 (Mass.
> 1999), where the defendant struck the victim with a
> hammer, the victim jumped up, and the defendant then
> switched to a knife and stabbed the victim several
> times.  The Massachusetts Supreme Judicial Court
> confirmed the holding that these "were separate acts

> that warranted two separate convictions of armed
> assault with intent to murder and a separate
> conviction of mayhem."  Id. at 1131.  The Simpson fact
> scenario is very close to the facts in Tracy's case
> and the conclusion that there were separate events
> does not warrant habeas relief.

Tracy, 400 F. Supp. 2d at 399 (parallel citations omitted).

The reasoning in Tracy, in turn, is rooted in principles

articulated in Blockburger.  In that opinion, the United States

Supreme Court relied upon the "distinction . . . between an

offence continuous in its character . . . and a case where the

statute is aimed at an offence that can be committed uno ictu,"

284 U.S. at 302 (quoting In re Snow, 120 U.S. 286 (1887)), and

held that separate sentences for two sales of the same drug, to

the same purchaser, on different days, did not violate the

Double Jeopardy Clause, Blockburger, 284 U.S. at 303.  In so

ruling, the Court cited its decision in Ebeling v. Morgan, 237

U.S. 625 (1915), in which it affirmed separate convictions and

sentences for several counts of willful tearing of mail bags

with intent to rob:

> These words [i.e., the words of the relevant
> statute] plainly indicate that it was the intention of
> the lawmakers to protect each and every mail bag from
> felonious injury and mutilation.  Whenever any one
> mail bag is thus torn, cut or injured, the offense is
> complete.  Although the transaction of cutting the
> mail bags was in a sense continuous, the complete
> statutory offense was committed every time a mail bag
> was cut in the manner described, with the intent
> charged.

Blockburger, 284 U.S. at 303 (quoting Ebeling, 237 U.S. at 629).

New Hampshire jurisprudence, as well, provides an example of the permissible division of a single transaction into several distinct offenses.  In Krueger, the defendant was convicted "on eighty counts of aggravated felonious sexual assault, seven counts of attempted aggravated felonious sexual assault, two counts of felonious sexual assault, and one count of simple assault," 146 N.H. at 541 (citations omitted), all arising out of a twenty-five-minute encounter that the defendant videotaped, see id. at 542.  After citing the double-jeopardy provision of the New Hampshire Constitution, the state supreme court affirmed the defendant's convictions on grounds that "[t]he evidence to sustain each of [the ninety] carefully worded indictments is different from the evidence required to sustain any of the other indictments," id. at 543.[6]  The statutes at issue in Krueger, and in particular RSA 632-A:2, I(l), are worded sufficiently similarly to the statutes at issue in this case to demonstrate that the New Hampshire Supreme Court would not quarrel with the unit of prosecution in this case.

---

[6] In ruling on Krueger's habeas petition, Judge McAuliffe observed:

> [E]ach indictment rested upon separate and distinct factual predicates.  Material facts necessary to prove one offense charged were different from the material facts necessary to prove each other charged offense.

Krueger, 238 F. Supp. 2d at 394.

As between <u>Brown</u> and <u>Young</u> on the one hand, and <u>Tracy</u> and <u>Krueger</u> on the other, this case falls in comfortably with <u>Tracy</u> and <u>Krueger</u>.  Most importantly, as with the indictments in <u>Tracy</u> and <u>Krueger</u>, but in contrast with the indictments in <u>Young</u>, the indictments in this case for first-degree assault and second-degree assault charged different conduct.  And, while the conduct in <u>Tracy</u> and <u>Young</u> consisted of distinct acts that were, nonetheless, similar in character, <u>i.e.</u>, multiple gunshots and multiple acts of sexual penetration, the conduct in this case consisted of distinct acts that were also different in character, <u>i.e.</u>, slamming Mary's head into the floor and strangling her.  Moreover, as with the two assault charges in <u>Tracy</u>, the two assault charges in this case were based upon injuries to different parts of the victim's body.  Finally, unlike <u>Brown</u>, where the temporal distance between the two instances of charged conduct was created by nothing more than the passage of time, the two acts underlying Pepin's two assault charges, banging Mary's head into the floor and strangling her to the point of unconsciousness, were separated by Pepin's own change in tactics, much as two of the gunshots in <u>Tracy</u> were separated by the shooter's change in position.

Pepin's altercation with Mary on the stairway of their home was "a single transaction [that gave] rise to multiple, distinct offenses."  <u>Young</u>, 159 N.H. at 341.  RSA 631:1 and RSA 631:2

both proscribe the infliction of serious bodily injury.  Pepin
was convicted of performing two different acts, slamming Mary's
head into the floor and strangling her, that resulted in serious
bodily injuries to different parts of her body.  If, rather than
committing the acts for which he was convicted, Pepin had pushed
Mary down the stairs and inflicted multiple injuries, such as a
broken arm and a broken leg, then perhaps the Double Jeopardy
Clause would permit only a single sentence for assault,
notwithstanding the fact that the victim had sustained injuries
to two parts of her body.  But here, the different injuries
resulted from different acts.

     In sum, under the circumstances of this case, where one
serious bodily injury resulted from Pepin's act of banging
Mary's head into the floor and another resulted from his act of
strangling her, and each, standing alone, would warrant a
conviction for assault, this court has no difficulty concluding
that the trial court's imposition of two sentences for two
assaults did not constitute double jeopardy.

### c. First-Degree Assault & Criminal Restraint

     In New Hampshire, a person is guilty of the Class A felony
of first-degree assault if, among other things, he or she
"[p]urposely causes serious bodily injury to another."  RSA
631:1, I(a).  A person is guilty of the Class B felony of

criminal restraint "if he [or she] knowingly confines another unlawfully in circumstances exposing him [or her] to risk of serious bodily injury."  RSA 633:2, I.  A conviction for first-degree assault (or second-degree assault) requires proof that the defendant inflicted serious bodily injury on another.  A conviction for criminal restraint does not.  A conviction for criminal restraint requires proof that the defendant confined another.  A conviction for first-degree assault (or second-degree assault) does not.  Thus, notwithstanding Pepin's bald assertion to the contrary, first-degree assault and criminal restraint are not the same crime for purposes of double jeopardy.  Moreover, as described in the relevant indictments, Pepin's convictions and sentences for those two felonies were based on different conduct.  Thus, the trial court's imposition of sentences for first-degree assault (or second-degree assault) and criminal restraint did not run afoul of the constitutional prohibition against double jeopardy.[7]

---

[7] I note that the New Hampshire Supreme Court has issued, but not yet released, an opinion regarding the merger doctrine as it relates to attempted kidnapping and attempted aggravated felonious sexual assault.  See State v. Casanova, No. 2011-570, 2013 WL 519516 (Feb. 13, 2013).  Because the indictments in that case, unlike those in this case, alleged the same conduct in support of two charges, there is nothing in Casanova to suggest that, on the facts of this case, the New Hampshire Supreme Court would merge Pepin's criminal restraint of Mary into his assaults on her.

### 3. Summary

For the reasons detailed above, I recommend that respondent be granted judgment as a matter of law on Claim 4. Such a disposition of Claim 4, in turn, has a direct bearing on several of Pepin's other claims, which are premised upon the existence of a double-jeopardy violation. Specifically, because I recommend that respondent be granted judgment as a matter of law on Claim 4, I also recommend that he be granted judgment as a matter of law on Claims 1(b), (d), and (f) as well as Claims 3(a)-(d). Those claims assert that Pepin received ineffective assistance of counsel due to the failure of his trial counsel or his appellate counsel to press the double-jeopardy issue discussed above. If Pepin's double-jeopardy claim is meritless then, necessarily, neither his trial counsel nor his appellate counsel provided ineffective assistance by failing to raise it. See United States v. Ventura-Cruel, 356 F.3d 66, 61 n.8 (1st Cir. 2003) (citing Acha v. United States, 910 F.2d, 32 (1st Cir. 1990); United States v. Victoria, 876 F.2d 1009, 1012-13 (1st Cir. 1989)). Given the foregoing recommendation, I turn to the only portions of Pepin's petition that do not involve double jeopardy: Claims 1(c) and (e), and Claims 2(a)-(d).

## B. Claim 1(c)

In Claim 1(c), Pepin asserts that he received ineffective assistance from his trial counsel because counsel failed to argue that his three convictions should have been merged into a single conviction under the rule of lenity.  Respondent does not mention the rule of lenity, but argues that Pepin's trial counsel did not perform deficiently by declining to press for merger because any such argument would have met with failure in the trial court, due to its lack of legal merit.  Pepin objects, but only to the extent of pointing out that respondent's motion cites no New Hampshire statute "that permits the state to convict and sentence [him] to multiple sentences for lesser-included offenses of assault, based on the merger, double jeopardy, and due process issues raised in the petition." Pet'r's Obj. (doc. no. 16), at 1.

### 1. Procedural History

Pepin mentioned both merger and lenity in his first habeas petition, but not in a way that distinguished those legal concepts from his argument that his trial counsel provided ineffective assistance by failing to take appropriate steps to protect him from double jeopardy.  Following Pepin's lead, Judge Nadeau did not separately address Pepin's trial counsel's failure to argue merger or lenity in her order on Pepin's first

habeas petition motion, and neither issue was mentioned in Pepin II or Judge Nadeau's order on remand.  In his second state-court habeas petition, Pepin raised the issue of merger and mentioned the rule of lenity.  As noted above, Judge Wageling dismissed Pepin's merger claim under the doctrine of res judicata.  Based upon the foregoing, the prudent course is to consider Claim 1(c) de novo.

### 2. Legal Principles

A criminal defendant claiming ineffective assistance of counsel, under the standard articulated in Strickland v. Washington, 466 U.S. 668 (1984), must "show both that his counsel provided deficient assistance and that there was prejudice as a result."  Harrington, 131 S. Ct. at 787; see also Wright v. Marshall, 656 F.3d 102, 108 (1st Cir. 2011) (citing Strickland, 466 U.S. at 687; Shuman v. Spencer, 636 F.3d 24, 31 (1st Cir. 2011)).  Turning to the first part of the Strickland analysis:

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness."  [Strickland,] 466 U.S. at 688.  A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance.  Id., at 689.  The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id., at 687.

Harrington, 131 S. Ct. at 787 (parallel citations omitted); see also Wright, 656 F.3d at 108.  In other words, "[j]udicial scrutiny of counsel's performance must be highly deferential." United States v. Valerio, 676 F.3d 237, 246 (1st Cir. 2012) (citation omitted).  That level of deference is intended "to avoid 'the distorting effects of hindsight' and allow [courts] 'to evaluate the conduct from counsel's perspective at the time.'"  United States v. Rodriguez, 675 F.3d 48, 56 (1st Cir. 2012) (citing Strickland, 466 U.S. at 689).

"With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"  Harrington, 131 S. Ct. at 787 (quoting Strickland, 466 U.S. at 694).  Thus, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'  Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'"  Harrington, 131 S. Ct. at 787-88 (quoting Strickland, 466 U.S. at 693, 687).

Finally, "the performance and prejudice components of the ineffectiveness inquiry are [both] mixed questions of law and fact."  Valerio, 676 F.3d at 246 (quoting Strickland, 466 U.S. at 689).  Thus, "[t]he standard of review applied 'depends, in

the last analysis, on the extent to which a particular question is fact-dominated or law-dominated.'"  Valerio, 676 F.3d at 246 (quoting Dugas, 506 F.3d at 8; citing Pike v. Guarino, 492 F.3d 61, 68 (1st Cir. 2007)).

### 3. Analysis

Claim 1(c) fails because even if Pepin's trial counsel had made an argument based on the rule of lenity, Pepin cannot demonstrate that any such argument was likely to have resulted in a different outcome, i.e., merger of his three convictions and the imposition of one sentence rather than three.  In New Hampshire:

> [T]he rule of lenity serves as a guide for interpreting criminal statutes where the legislature failed to articulate its intent unambiguously.  This rule of statutory construction generally holds that ambiguity in a criminal statute should be resolved against an interpretation which would increase the penalties or punishments imposed on a defendant.

In re Alex C., 161 N.H. 231, 239 (2010) (quoting State v. Dansereau, 157 N.H. 596, 602 (2008)).  In the double-jeopardy context, "[w]hen a statutory provision is ambiguous, the rule of lenity demands that all doubt be resolved against turning a single transaction into multiple offenses and thereby expanding the statutory penalty."  State v. Jennings, 155 N.H. 768, 777 (2007) (citing State v. Cobb, 143 N.H. 638, 647 (1999)).  "However, the rule of lenity 'is applicable only where statutory

ambiguity has been found.  Lenity thus serves only as an aid for resolving an ambiguity; it is not to be used to beget one.'" Jennings, 155 N.H. at 777 (quoting State v. Bailey, 127 N.H. 811, 814 (1986)).  Under New Hampshire law, a statute is ambiguous when it is susceptible of more than one reasonable interpretation.  See In re Liberty Assembly of God, 163 N.H. 622, 627 (2012); Union Leader Corp. v. N.H. Ret. Sys., 162 N.H. 673, 677 (2011) ("Since there is more than one reasonable interpretation of the[ ] statutory provision[ ], we conclude that the statute is ambiguous. . .") (quoting In re Gamas, 158 N.H. 646, 649 (2009)).

In Jennings, which was a "unit of prosecution" case, the New Hampshire Supreme Court ruled that the state's pattern sexual-assault statute, RSA 632-A:2, III, did not contain any ambiguity that barred the trial court from sentencing the defendant for three separate violations of that statute, based upon three separate patterns of sexual assault.  See 155 N.H. at 777-79.  This case presents a somewhat different scenario. Pepin was not sentenced for three violations of the same statute; he was sentenced for violating three separate statutes. Accordingly, the relevant question here is whether RSA 631:1, I(a), contains an ambiguity that could have been resolved in Pepin's favor, with the effect of precluding the trial court from sentencing him for violating RSA 631:1, I(a), RSA 631:2,

I(a), and RSA 633:2, I, based upon the conduct alleged in the indictments and proven at trial.  RSA 631:1, I(a) contains no such ambiguity.

When interpreting a statute, the New Hampshire Supreme Court "first look[s] to the language of the statute itself, and, if possible, construe[s] that language according to its plain and ordinary meaning."  State v. Matton, 163 N.H. 411, 412 (2012) (citing State v. Beauchemin, 161 N.H. 654, 658 (2011)).  In addition, that court "do[es] not read words or phrases in isolation, but in the context of the entire statutory scheme."  Matton, 163 N.H. at 412 (citing N.H. Health Care Assoc. v. Governor, 161 N.H. 378, 385 (2011)).  Finally, the court construe[s] the Criminal Code provisions 'according to the fair import of their terms and to promote justice.'"  Matton, 163 N.H. at 412 (quoting RSA 625:3 (2007)).

RSA 631:1, I(a), makes it unlawful to "[p]urposely cause[ ] serious bodily injury to another."  For his part, Pepin does not identify any particular ambiguity in that statute.  To prevail, he would have to show that it is reasonable to construe RSA 631:1, I(a), as establishing a unit of prosecution consisting of an entire altercation, regardless of: (1) the number of injury-causing acts it involves; (2) the number of other unlawful acts it involves; and (3) the range of unlawful conduct it involves.

RSA 631:1, I(a), proscribes the infliction of serious
bodily injury.  There is nothing in the language of that statute
that could be read as even hinting that the legislature intended
to proscribe a course of conduct resulting in more than one
serious bodily injury as opposed to proscribing the infliction
of the injuries themselves.  Cf. Krueger, 146 N.H. at 543
(construing statute making it unlawful to "engage[ ] in sexual
penetration with another person" as criminalizing each separate
act of sexual penetration rather than twenty-five minute episode
during which acts were committed) (quoting RSA 632-A:2, I(l)).
There is even less support in the language of RSA 631:1, I(a),
for the proposition that the legislature intended that once a
person inflicted one serious bodily injury, he or she was free
to inflict additional serious bodily injuries without additional
criminal liability, so long as all the injuries were inflicted
in the context of a single altercation, however that might be
defined.  Finally, there is absolutely no support in RSA 631:1,
I(a), for the proposition that the legislature intended to
protect an assailant from liability for other criminal acts,
such as criminal restraint, so long as those acts were carried
out in association with a first-degree assault.  Absent any
statutory ambiguity for the trial court to have resolved in
Pepin's favor, this case presented no occasion for the
application of the rule of lenity.  See Alex C., 161 N.H. at

41

239-40.  Thus, there is no likelihood that Pepin would have received any less than three sentences had his trial counsel made an argument based upon the rule of lenity.  For that reason, Pepin's argument on this point founders on the prejudice prong of the Strickland test.  Accordingly, respondent is entitled to judgment as a matter of law on Claim 1(c).

### C. Claim 1(e)

In Ground One of his petition, under the heading "Supporting facts," which asked him to "state the specific facts that support[ed] [his] claim," Pepin asserted: "Trial counsel provided ineffective assistance of counsel by failing to . . . argue or raise . . . Rules 410, 609."  Pet. (doc. no. 1), at 5. In my order on preliminary review, I construed that assertion in the following way: "Pepin received ineffective assistance of counsel, in violation of his Sixth and Fourteenth Amendment rights, when his trial attorney failed to: . . . (e) object to evidence improperly admitted at trial under N.H.R. Ev. 410 and 609."  Order (doc. no. 5), at 10.  Neither Pepin's petition nor my order specifically identified the evidence that, according to Pepin, his trial counsel improperly allowed to be admitted without a proper objection.

In the memorandum of law in support of his motion for summary judgment, without any guidance from either petitioner or

the court, respondent "conclude[d] that the petitioner wishes to challenge the admission of his nolo contendere plea at trial," doc. no. 15-1, at 23, and argues that Pepin's counsel did not provide ineffective assistance because neither Rule 410 nor Rule 609 "would have prevented the admission of [that] evidence," id. Pepin does not address Claim 1(e) in his two-page objection to respondent's summary-judgment motion.

Upon further reflection, it may have been a bit generous to allow Claim 1(e) past preliminary review, given Pepin's failure to articulate any factual support for that claim. See Ashcroft v. Iqbal, 556 U.S. 662, ___, 129 S. Ct. 1937, 1949 (2009); Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam). But, on the other hand, given the fairly specific subject matter of Rules 410 and 609, it is not very difficult to ascertain the evidence that, in Pepin's view, his trial counsel should have tried to block. In any event, I will address Claim 1(e) on the merits.

### 1. Procedural History

In his direct appeal, Pepin argued that the trial court: (1) admitted evidence of the threats he made against Mary in May of 2004 in violation of Rule 404(b) of the New Hampshire Rules of evidence; and (2) allowed the State to cross-examine him with regard to his criminal-threatening conviction in violation of

Rule 609(a), because his conviction was for a Class B

misdemeanor.[8]  The state supreme court rejected Pepin's first

argument on the merits and disposed of his second argument this

way:

> The defendant next contends that the trial court
> erred by permitting the State to introduce on cross-
> examination evidence that he pled nolo contendere to
> the criminal threatening charge.  He asserts that this
> violated Rule 609(a).  See N.H. R. Ev. 609(a).  We
> decline to address this argument because the defendant
> has failed to demonstrate that he preserved it for our
> review.  While the record demonstrates that the
> defendant objected based upon Rule 404(b), it does not
> reflect that he did so based upon Rule 609(a).  See
> [State v.] Croft, 142 N.H. [76,] 80 [(1997)].

Pepin I, 156 N.H. at 279.

In his first habeas petition, Pepin argued that his trial

counsel performed ineffectively by failing to object to the

admission of evidence concerning: (1) his nolo plea, under Rule

410; and (2) his conviction for criminal threatening, under Rule

609.  With regard to Rule 609, Pepin argued that his conviction

was categorically inadmissible because he was convicted of a

Class B misdemeanor, and that his counsel's failure to make a

Rule 609 objection resulted in the trial court's failure give

---

[8] Without developing any argument on this point, Pepin also
asserted that his nolo plea was admitted in violation of Rule
410.

the jury a limiting instruction.[9]  Judge Nadeau denied Pepin's

motion, ruling that his claim based on Rule 410 was procedurally

barred and that his claim based on Rule 609 failed on the

merits, because the previous conviction at issue fell outside

the scope of Rule 609(a).  Pepin appealed Judge Nadeau's order,

but the New Hampshire Supreme Court declined to review her

resolution of Pepin's claims that his trial counsel provided

constitutionally deficient representation by failing to make

objections based upon Rules 410 and 609.  See Pepin II, 159 N.H.

at 311.

### 2. Analysis

As noted, respondent argues that Claim 1(e) fails on the

second prong of the Strickland test.  Specifically, he argues

that: (1) even if Pepin's counsel had objected to the admission

of his nolo plea in reliance on Rule 410 or Rule 609, neither

objection would have been sustained; (2) the trial court only

allowed Pepin's plea and conviction into evidence because Pepin

himself opened the door by minimizing the threat he had made

against Mary; and (3) even without the evidence Pepin says

---

[9] Pepin did not indicate what sort of limiting instruction
his counsel should have requested.  Beyond that, it seems
somewhat inconsistent to argue, as Pepin does, that his
conviction was categorically inadmissible and that he was
entitled to a limiting instruction, given that the objective of
a limiting instruction is to direct a jury's consideration of
admissible evidence and ensure that such evidence is considered
only for the limited purpose for which it was admitted.

should not have been admitted, he still would have been convicted, given the weight of the other evidence against him. I agree that Claim 1(e) fails.  In the section that follows, I consider in turn each of the two aspects of Claim I(e).

### a. Rule 410

I begin by noting that in his memorandum of law, respondent addresses Pepin's trial counsel's lack of objections under Rules 410 and 609 in a single argument, and does not rely upon or otherwise address Judge Nadeau's determination that Pepin's claim based on the lack of a Rule 410 objection had been procedurally defaulted.  Thus, like respondent, the court turns to the merits of that claim.  Given the lack of any substantive ruling by the state courts on that claim, it is subject to de novo review.  See Dugas, 506 F.3d at 7.

To restate, Pepin's claim is that his trial counsel provided ineffective assistance by failing to object to the introduction of evidence of his plea of nolo contendere to the charge of criminal threatening.  Rule 410 provides that evidence of a plea of nolo contendere "is not, in any civil or criminal proceeding, admissible against the defendant who made the plea." Here, evidence of Pepin's nolo plea was admitted.  But, given the circumstances in which that evidence was admitted, it is not at all clear that Pepin's plea was admitted against him.  Pepin

was twice asked whether he had been convicted of criminal threatening.  Twice he evaded the question by responding that he had pled nolo to such a charge.  Thus, it would seem that in Pepin's view, his nolo plea was less damaging than his conviction, which makes it reasonable to view the admission of the nolo plea as being evidence for Pepin rather than evidence against him.

Beyond that, while Pepin now claims that his counsel provided ineffective assistance by failing to object to the admission of his nolo plea, the court is unable to discern how Pepin's counsel could have reasonably interposed an objection to that evidence, and Pepin offers no guidance on this point.

Just before evidence of Pepin's nolo plea came in, Judge Nadeau had ruled that evidence of his conviction was admissible, as a result of Pepin's testimonial efforts to soft-peddle evidence of one of his threats against Mary.  Based upon Judge Nadeau's ruling, counsel for the State asked Pepin about his conviction.  Rather than admitting to his conviction, Pepin testified that he had pled nolo to the criminal-threatening charge.  Counsel for the State did not ask Pepin about his nolo plea or seek to introduce any other evidence of it; Pepin voluntarily testified about his nolo plea in an attempt to avoid testifying that he had been convicted.

Given the foregoing scenario, it is difficult to see how Pepin's trial counsel could have objected to the introduction of evidence concerning Pepin's <u>nolo</u> plea short of asking the judge to instruct the jury to disregard his client's testimony. By doing so, Pepin's counsel would have run a significant risk of diminishing the jury's opinion of Pepin and, if testimony concerning the <u>nolo</u> plea had been stricken, that would have paved the way to the introduction of evidence concerning Pepin's conviction. In short, Pepin's counsel appears to have followed a rather wise strategy of leaving well enough alone. Because Pepin's counsel's decision not to object to his own client's testimony was not a trial strategy that fell below an objective standard of reasonableness, <u>see</u> <u>Harrington</u>, 131 S. Ct. at 787, to the extent that Claim 1(e) is based upon the admission of evidence of Pepin's <u>nolo</u> plea, respondent is entitled to judgment as a matter of law.

### b. Rule 609

Pepin's claim that his trial counsel performed ineffectively by failing to raise an objection based upon Rule 609 is even weaker than his claim concerning the lack of a Rule 410 objection. Because that claim was adjudicated on the merits, AEDPA's strict standard of review applies. <u>See</u> <u>Lyons</u>, 666 F.3d at 53-54.

Unlike Rules 404(b) and 410, both of which act to bar the admission of certain kinds of evidence, subject to various exceptions, Rule 609 acts to allow certain kinds of evidence. Specifically, Rule 609(a) provides that the credibility of an accused, when testifying, may be impeached by: (1) evidence that the accused has been convicted of a crime punishable by death or by imprisonment in excess of one year, "if the court determines that the probative value of admitting [such] evidence outweighs its prejudicial effect to the accused"; and (2) evidence that the accused has been convicted of any crime "if it readily can be determined that establishing the elements of the crime required proof or admission of an act of dishonesty or false statement by the witness."

Pepin argues that because his conviction was for a Class B misdemeanor, Rule 609(a) barred its admission, and his counsel performed ineffectively by failing to raise a Rule 609 objection.  There are several problems with Pepin's claim.

First, while Pepin treats Rule 609(a) as establishing a categorical bar to the admission of misdemeanor convictions, it does no such thing.  Rule 404(b) is the rule that bars the admission of evidence of prior crimes, subject to certain

exceptions.[10]  Here, Judge Nadeau ruled that evidence of Pepin's threats against Mary in May, and evidence of his conviction for making those threats, was admissible to demonstrate his intent on the night he engaged in the conduct for which he was charged. All that Rule 609(a) does is limit the kinds of misdemeanors that may be used as evidence for attacking the general credibility of a witness.  Pepin's counsel's decision not to make a Rule 609 objection did not fall below an objective standard of reasonableness, see Harrington, 131 S. Ct. at 787, because, under the circumstances of this case, Rule 609 did not apply.

"Rule 609 does not apply where evidence of a conviction is being offered on a theory other than attacking the credibility of a witness."  State v. Pugliese, 129 N.H. 442, 443 (1987) (quoting 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 609-70, at 157-58 (1986)); citing United States v. Gaertner, 705 F.2d 210, 216 (7th Cir. 1983); United States v. Ebner, 782 F.2d 1120, 1126 (2d Cir. 1986)).  That is just what happened here.

The State initially asked the court to admit evidence of Pepin's conviction as evidence that he had threatened Mary in May of 2004.  In moving for the admission of that evidence, the

---

[10] Unlike Rule 609(a), which draws a distinction between felonies and misdemeanors, Rule 404(b), which allows the admission of evidence of other crimes for purposes such as proving intent, does not draw such a distinction.

State relied up Rule 404(b).  While evidence of Pepin's

conviction also undermines the credibility of the testimony in

which he attempted to minimize the threats he made, that sort of

incidental impact on credibility does not run afoul of Rule 609,

which is concerned with general impeachment.  See Pugliese, 129

N.H. at 443; State v. Mello, 137 N.H. 597, 600-601 (1993).  As

the New Hampshire Supreme Court explained in Mello:

> We think that Rule 608, like its counterpart,
> Rule 609 relative to convictions, is directed at the
> use of such evidence to impeach a witness's general
> credibility.  See State v. Hopkins, 136 N.H. 272, 276,
> (1992) (trial court has discretion to allow inquiry on
> cross-examination under Rule 608(b) "for the limited
> purpose of impeaching the witness's credibility"); cf.
> State v. Pugliese, 129 N.H. 442, 443 (1987) (apparent
> object of Rule 609 to limit admissibility to
> convictions sufficiently probative "to justify general
> impeachment" (emphasis added)).  Here, the evidence of
> the defendant's prior arrest was used not to impeach
> him generally but to prove that, when he testified
> that he had never been arrested and then that he had
> only been taken in for drunkenness, he "gave a
> knowingly false answer under oath in response to his
> own counsel's question on direct examination."
> Pugliese, 129 N.H. at 443; accord State v. Norgren,
> 136 N.H. 399, 401 (1992).

> "[T]he defendant, by presenting certain evidence,
> may 'open the door' to the introduction of otherwise
> inadmissible evidence for the limited purpose of
> impugning the veracity of the witness presented by the
> defendant."  State v. Sullivan, 131 N.H. 209, 213
> (1988).  If a defense witness lies on the stand and
> thereby creates a "misleading advantage," the State is
> entitled to counter with evidence "to refute the
> impressions created by his . . . testimony."  Id.

> As we held in Pugliese and Norgren, the
> defendant's own testimony opened the door to what
> otherwise would have been impermissible impeachment

> evidence, and the constraints of Rule 608 simply did
> not apply.  To apply Rule 608 to forbid the testimony
> at issue here "would convert a general rule . . . into
> a license to make affirmative misrepresentations and
> commit perjury without fear of contradiction."
> Pugliese, 129 N.H. at 443.

137 N.H. at 600-601 (parallel citations omitted).  Here, Pepin

opened the door to the introduction of evidence of his

conviction by attempting to minimize the threats he made against

Mary.  Thus, Rule 609 did not apply, and Pepin's trial counsel

did not perform deficiently by failing to make a Rule 609

objection.

The bottom line is this: Judge Nadeau's rejection of

Pepin's claim that his counsel performed deficiently by failing

to object to the admission of evidence of his conviction was

neither contrary to nor an unreasonable application of clearly

established federal law.  See Harrington, 131 S. Ct. at 785.

Thus, to the extent that Claim 1(e) is based upon the lack of a

Rule 609 objection to the admission of evidence of Pepin's

conviction, respondent is entitled to judgment as a matter of

law.

D. Claims 2(a)-(d)

In Claim 2, Pepin asserts that he received ineffective

assistance from his appellate counsel because counsel briefed

four issues known to be unpreserved.  Respondent argues that

Claim 2: (1) has been waived; (2) has not been exhausted; and

(3) fails on the merits.  I agree that Claim 2 fails on the

merits, under either of the two potentially applicable standards

of review.

In Smith v. Robbins, the United States Supreme Court

described the contours of a claim of ineffective assistance of

appellate counsel in a case in which the accused counsel did not

file a merits brief:

> On remand, the proper standard for evaluating
> Robbins' claim that appellate counsel was ineffective
> in neglecting to file a merits brief is that
> enunciated in Strickland v. Washington, 466 U.S. 668
> (1984).  See Smith v. Murray, 477 U.S. 527, 535-536
> (1986) (applying Strickland to claim of attorney error
> on appeal).  Respondent must first show that his
> counsel was objectively unreasonable, see Strickland,
> 466 U.S., at 687-691, in failing to find arguable
> issues to appeal – that is, that counsel unreasonably
> failed to discover nonfrivolous issues and to file a
> merits brief raising them.  If Robbins succeeds in
> such a showing, he then has the burden of
> demonstrating prejudice.  That is, he must show a
> reasonable probability that, but for his counsel's
> unreasonable failure to file a merits brief, he would
> have prevailed on his appeal.  See id., at 694
> (defendant must show "a reasonable probability that,
> but for counsel's unprofessional errors, the result of
> the proceeding would have been different").

528 U.S. 259, 285-86 (2000) (parallel citations omitted).

Moreover, "[t]he performance component need not be addressed

first.  'If it is easier to dispose of an ineffectiveness claim

on the ground of lack of sufficient prejudice . . . that course

should be followed.'"  Smith, 528 U.S. at 286 n.14 (quoting

Strickland, 466 U.S. at 697.

Claim 2 fails due to a lack of prejudice.  Pepin claims that his appellate counsel provided ineffective assistance by briefing four issues on which he could not prevail, because they had not been preserved by trial counsel.  Assuming that it was objectively unreasonable for Pepin's appellate counsel to brief those issues, there is no argument to be made that Pepin would have won his appeal had appellate counsel not briefed them.  Thus, Pepin cannot establish prejudice.  Moreover, even if the court were to construe Claim 2 in concert with Claim 3, as asserting that Pepin was prejudiced by his appellate counsel's focus on the issues identified in Claim 2 at the expense of those identified in Claim 3, there is still no prejudice, given the court's determination that none of the issues identified in Claim 3 has any legal merit.  That is, there is no likelihood that Pepin would have prevailed on his appeal if his appellate counsel had briefed the various double-jeopardy issues identified in Claim 3 rather than briefing the four issues on which Pepin did not prevail.  Accordingly, respondent is entitled to judgment as a matter of law on Claim 2.

### Conclusion

For the reasons detailed above, I recommend that respondent's motion for summary judgment, document no. 15, be granted.  Moreover, Because Pepin has failed to make a

substantial showing of the denial of a constitutional right, I
recommend that the court decline to issue a certificate of
appealability.  See 28 U.S.C. § 2253(c)(1); Rule 11, Rules
Governing Habeas Corpus Review under Section 2254; First Cir. LR
22.0.

Any objections to this report and recommendation must be
filed within fourteen days of receipt of this notice.  See Fed.
R. Civ. P. 72(b)(2).  Failure to file objections within the
specified time waives the right to appeal the district court's
order.  See United States v. De Jesús-Viera, 655 F.3d 52, 57
(1st Cir. 2011), cert. denied, 132 S. Ct. 1045 (2012); Sch.
Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 564 (1st
Cir. 2010) (only issues fairly raised by objections to
magistrate judge's report are subject to review by district
court; issues not preserved by such objection are precluded on
appeal).

_____
Landya McCafferty
United States Magistrate Judge


February 22, 2013

cc:  Jeffrey S. Pepin, pro se
     Elizabeth C. Woodcock, Esq.